### George L. Cragg et al. v. Charles A. Brown.
#### Gen. No. 12.731.

1. PARTNERSHIP—*right of partner to attend to private business.* In the absence of any special agreement restraining the rights of partners, they may give necessary time and attention to their pri-

vate affairs where it is not shown that any firm business has suffered thereby.

Bill for accounting. Appeal from the Superior Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1905. Affirmed in part and reversed in part with directions. Opinion filed November 23, 1906.

**Statement by the Court.** George L. Cragg on September 10, 1902, filed a bill of complaint in the Superior Court against Charles A. Brown and A. Miller Belfield, asking an accounting of the property, dealings and transactions of certain partnerships known as Charles A. Brown, Cragg & Belfield, and Charles A. Brown & Cragg, and particularly as to certain shares of stock acquired by the defendant Brown during the existence of the latter firm which were alleged by the complainant to be rightfully the property of one or both of said firms.

The bill sets out the formation of the co-partnership of Charles A. Brown, Cragg & Belfield on March 1, 1901, for the general practice of law and transaction of all legal business, and particularly of the practice of patent law; that on the 28th day of February, 1902, Belfield withdrew from said firm, and a supposed settlement of the business of said firm as between Belfield on one side and Brown and Cragg on the other was agreed upon and made, of all partnership assets and business, so far as was then known to complainant, and so far as was known to said Belfield; that immediately upon the withdrawal of said Belfield from the firm, the co-partnership of Charles A. Brown and Cragg was formed, and commenced business from the 1st day of March, 1902, the co-partnership agreement providing that it should continue for a period of five years.

The bill then sets out the interest of the respective partners in said firms, and avers that during the existence of the firm of Charles A. Brown, Cragg & Bel-

field, the firm transacted all kinds of legal business as contemplated in the co-partnership agreement, including the practice of corporation law, the organization, promotion and reorganization of corporations, soliciting patents and transacting other patent business; that at the time of the formation of said firm of Charles A. Brown, Cragg & Belfield, the firm had as a client The Stromberg-Carlson Telephone Manufacturing Company, a corporation of Illinois, and did a large amount of work in the patent law for said corporation, including work of a general legal nature, and giving advice as to legal and business questions relating to said corporation, and that the business done by said corporation was, so far as the complainant knows and believes, duly and customarily placed upon the books of said firm as a partnership business.

The bill avers that during the fall of the year 1901, or during the winter of 1901-2, the officers and stockholders of The Stromberg-Carlson Telephone Manufacturing Company became desirous of reorganizing said corporation and enlarging and extending the scope of its business; that the defendant, Charles A. Brown, was consulted by some of the officers or stockholders of said company, and by other persons interested in having said company reorganized, concerning the enlargement and reorganization of said company, and that during the months of January and February, and during a portion or all of the month of March, 1902, Brown rendered important and valuable services to said The Stromberg-Carlson Telephone Manufacturing Company, and some of its officers and stockholders, and to other persons interested in said reorganization, and especially to one Eugene H. Satterlee and to one Thomas W. Finucane, both of Rochester, New York, which services were of great value and importance and related to and were necessary to the reorganization of the corporation and the business of said The Stromberg-Carlson Telephone Manufacturing Company of Illinois, and the promotion and formation and

organization of the corporation under the laws of the state of New York to purchase and take over, add to and increase the business, assets and capital of the Illinois company.

The bill further avers that early in the year 1902, partly as the result of the advice given and other services rendered by said defendant Brown, there was organized under the laws of the state of New York a corporation known as The Stromberg-Carlson Telephone Manufacturing Company with a capital stock of 15,000 preferred shares of the par value of $100 each, and 15,000 common shares of the par value of $100 each; and that said Brown, while a member of said firm of Charles A. Brown, Cragg & Belfield, and subsequently of the firm of Charles A. Brown & Cragg, rendered services and gave advice of great value and importance in the matter of the promotion and organization of said New York corporation; that such services occupied a large portion of the time of said Brown during said period, and embraced assistance in the valuation and transfer of the assets and business of the Illinois corporation to the New York corporation, the underwriting of the stock of the New York corporation, the giving of legal and general advice regarding all important features of the organization of said New York corporation, and the transfer to it of the assets and capital of said Illinois corporation, all of which services and advice were within the purview and scope of the partnership business of the said firms of Charles A. Brown & Cragg, and Charles A. Brown, Cragg & Belfield.

The bill avers that on or about the 22nd day of March, 1902, the said Charles A. Brown entered into a contract in writing with The Stromberg-Carlson Telephone Manufacturing Company of Illinois, which contract is in words and figures as follows, to wit:

"Agreement made this 22nd day of March, 1902, between Charles A. Brown of Chicago, Illinois, and The Stromberg-Carlson Telephone Manufacturing Com-

Cragg v. Brown.

pany, a corporation organized under the laws of the state of Illinois, and having its principal office at Chicago.

Witnesseth, That the said Brown hereby covenants and agrees to and with the said company as follows:

1st. That he will for a period of five years, beginning April 1st, 1902, devote his services to the interests of said corporation.

2nd. That he will not for a period of five years beginning April 1st, 1902, accept employment of any character hostile to the interests of said corporation.

3rd. That the engagement for services shall extend to any partnership of which the said Brown shall be a member during the life of this contract.

4th. That the charges for services shall be at the rate of five dollars ($5.00) an hour for the time actually devoted to the service of the Stromberg-Carlson Telephone Manufacturing Company, and at the rate of fifty dollars ($50.00) for each application for patent, provided that in special cases this rate may be modified by mutual consent upon prior notice. It is understood that disbursements and expenses in traveling shall be paid for by The Stromberg-Carlson Telephone Manufacturing Company in addition to payment for services.

5th. Said Brown further agrees with said The Stromberg-Carlson Telephone Manufacturing Company that it may assign all its interests in this contract, subject to all the obligations of said corporation, to any corporation hereafter organized for the purpose of taking over the capital stock and property of the said corporation; and he covenants that he will fulfill for such corporation any and all his obligations under this instrument not performed by him prior to the date of said assignment.

6th. And the said The Stromberg-Carlson Telephone Manufacturing Company hereby covenants and agrees to pay said Brown each month the service charges for the preceding month, together with all disbursements, for and during the five years hereinbefore mentioned, and further covenants and agrees that said Brown shall have complete and exclusive charge of

all the patent work, including patent litigation and patent soliciting of The Stromberg-Carlson Telephone Manufacturing Company, and of its successors and assigns for and during the period of five years provided for herein.

In witness whereof the said Brown has hereunto affixed his hand and seal and the said The Stromberg Carlson Telephone Manufacturing Company has caused its seal to be hereto affixed and the instrument to be signed by its duly authorized directors the day and year first above written.

CHARLES A. BROWN,
STROMBERG-CARLSON TELEPHONE
MANUFACTURING COMPANY,
By A. L. F. STROMBERG, Pres.''

The bill further shows that on the same day, the 22nd day of March, 1902, said Charles A. Brown entered into a contract in writing with Thomas W. Finucane and Eugene H. Satterlee, of Rochester, New York, which contract is in words and figures as follows, to wit:

"Agreement made this 22nd day of March, 1904, between Charles A. Brown, of Chicago, party of the first part, and Thomas W. Finucane and Eugene H. Satterlee, of Rochester, New York, parties of the second part, witnesseth:

Whereas, said parties of the second part are promoting the organization of a company to be incorporated under the laws of the state of New York, to take over the capital stock or the property, or both, of The Stromberg-Carlson Telephone Manufacturing Company of Chicago, the capital of which said proposed New York State corporation is to consist of fifteen thousand (15,000) preferred shares, and fifteen thousand (15,000) common shares of the par value of one hundred dollars ($100.00) each; and

Whereas, said parties of the second part deem the contract, a copy of which is hereto annexed, to be essential to the success of the said proposed new company, and of assistance in the organization thereof,

Now, therefore, it is agreed that in consideration of the execution and delivery by party of the first part

of the said contract to parties of the second part, execution and delivery of which is hereby acknowledged by parties of second part, parties of second part shall deliver to party of first part 340 preferred shares and 993 common shares of the capital stock of said new company.

In Witness Whereof, the said parties hereto have hereunto set their hands and seals the day and year first above written.

CHARLES A. BROWN,      [SEAL.]
THOMAS W. FINUCANE,   [SEAL.]
EUGENE H. SATTERLEE.    [SEAL.] "

The bill avers that the first of said contracts is the contract mentioned in the second contract; and that shortly thereafter the certificates of stock mentioned in said second contract were duly issued in the name of said Brown, and delivered to him in accordance with the provisions of said second contract and that subsequently the said certificates of stock were surrendered by Brown to the officers of the New York corporation, and for the convenience and at the request of said Brown, new certificates for said 993 shares of stock were issued to Brown and delivered to him, in lieu and in place of the above described certificates, said new certificates being numbered as follows: Certificate No. 318, dated April 26, 1902, for 680 shares of common stock of said new corporation; certificate No. 319, dated April 26, 1902, for 313 shares of common stock of said corporation, both of which said certificates were registered April 29, 1902, at the German-American Bank of Rochester, New York; and that shortly after the making of said contract certificates of stock in the said Stromberg-Carlson Telephone Manufacturing Company of New York were issued and delivered to Brown as follows: Certificate No. 273 for 100 shares of the preferred stock; certificate No. 274 for 100 shares of the preferred stock; certificate No. 275 for 100 shares of the preferred stock; and certificate No. 276 for 100 shares of the preferred stock of said New York cor-

poration, each and all of said four last mentioned certificates being dated April 15, 1902, and registered at the said German-American Bank of Rochester, New York; that the said four certificates for 100 shares each of the preferred stock of said corporation embraced the 340 shares of such stock provided for in said contract above described to be delivered to said Brown by said Finucane and Satterlee, and in addition thereto sixty shares of stock which the complainant is informed and believes were and are compensation or remuneration to said Brown for other and additional legal or promotion services rendered by him to said New York company, or the officers thereof, or to said Finucane and Satterlee, or to some one or more of them.

The bill then charges that Brown has received and fraudulently appropriated said shares of stock and the dividends thereon as and for his own individual property and to his own use, and has wrongfully refused, and still refuses, to transfer, assign, deliver or set over any portion of said shares of stock or the proceeds thereof, or the dividends or any portion thereof upon said shares of stock to complainant, or, so far as the complainant is informed and believes, to said Belfield.

The bill avers that the services so rendered by said Brown in the formation and organization of said New York corporation, and in the purchase by it and transfer to it of the business, assets and capital stock of said Illinois corporation, were all within the purview and scope of the business for the transaction of which the said firms of Charles A. Brown, Cragg & Belfield, and Charles A. Brown & Cragg were organized; and that the proceeds, remuneration or compensation for such services rendered or to be rendered should be, were and are rightfully the property of said firm of Charles A. Brown, Cragg & Belfield or the firm of Charles A. Brown & Cragg, or both of them, in the proportion to which they may be entitled; and that the said stock and the proceeds therefrom, or the dividends therefrom, are not the individual property of said Charles A.

Cragg v. Brown.

Brown, and that the complainant is entitled to and claims his partnership share in said stock received by said Brown as aforesaid, and in the proceeds or dividends therefrom.

The defendant Belfield answered the bill consenting to an accounting and admitting the allegations of the bill so far as they alleged the shares of stock to be the property of the firm of Charles A. Brown, Cragg & Belfield, and filed a cross-bill alleging the same facts and praying for an accounting and distribution of the stock among the members of said firm according to their respective interests.

The complainant filed an answer to the cross-bill consistent with the allegations of his bill of complaint.

Appellee Brown filed a plea to the bill October 6, 1902, and in his answer filed in support of the plea stated that he had been a stockholder in the Stromberg-Carlson Co., as had been his father-in-law and his wife, and that prior to the stock contract 993 shares had been bargained for and were the agreed equivalent upon exchange for the original shares belonging to him and to his wife and certain private obligations personal to appellee, and that said stock contract merely provided for the delivery of the shares mentioned therein to appellee, which shares were and have been the property of appellee and his wife, and that the stock contract merely provided for the delivery of the shares mentioned to him upon such exchange.

As to the 400 shares of preferred stock which included the 340 shares preferred, the subject of controversy in this suit, he stated in that answer he bought those 400 shares for cash and paid for them with his personal means and that they were his (appellee's) private and personal property.

In his amended answer filed October 17, 1902, he says:

"Further answering this defendant admits that on or about the 22nd day of March, 1902, he executed a certain service contract in writing with the said The

Stromberg-Carlson Telephone Manufacturing Company of Illinois, which said contract this defendant believes to be substantially in the words and figures set forth in the bill of complaint herein."

Further on he says: "This defendant admits that on or about the said 22nd day of March, 1902, a certain other contract was executed between this defendant and one Thomas W. Finucane and Eugene H. Satterlee; but this defendant does not admit that the supposed copy thereof set forth in the said bill of complaint, and therein referred to as the stock contract, is a true copy."

The answer further states: "This defendant expressly denies that he entered into said service contract so-called, or said stock contract so-called, as a member of said firm of Charles A. Brown & Cragg, or that the said complainant and the said A. Miller Belfield have or had anything whatsoever to do with, or any possible interest in, said alleged contracts, or either of them."

The answer then admits that the said so-called service contract, dated the 22nd of March, 1905, is the contract referred to in the said stock contract, so-called, executed by the defendant and the said Finucane and Satterlee on the same day; and the answer admits the delivery of the certificates of stock as charged in the bill, but denies that the consideration of said shares of stock was the execution of said service contract or any services rendered or to be rendered by Brown as a member of said co-partnerships, or either of them.

The defendant Brown further alleges in his answer that a long time prior to the execution of said so-called stock contract the said 993 shares of common stock and 340 shares of preferred stock of the New York corporation had been bargained for by the defendant and that the same were received by the defendant in exchange for the original shares of stock of The Stromberg-Carlson Telephone Manufacturing Company of Illinois, the private property of this defendant and de-

Cragg v. Brown.

fendant's wife, and for certain personal obligations from said Illinois corporation to the defendant; and that all of the arrangements for the acquisition by the defendant and his wife of the shares of stock were made long prior to the execution of said contracts, and long prior to any thought of said contracts, and were wholly disconnected therefrom.

Replications were filed to the bill and cross-bill and the cause was referred to a master to take evidence and report the same to the court, together with his conclusions of law and fact. The master reported, finding that the defendant Brown was liable to account to the complainant Cragg for forty shares of common stock of the New York company as the property of the firm of Charles A. Brown & Cragg, and that upon such accounting the complainant was entitled to twelve of said shares and to dividends paid thereon since the receipt of the same by the defendant; and recommended that the cross-bill of Belfield be dismissed for want of equity and that a decree be entered in accordance with the finding.

Objections and exceptions were filed to the master's report, and the court on hearing overruled all of the exceptions of Cragg and Belfield and sustained the exceptions of Brown, and entered a decree dismissing the cross-bill for want of equity, and that so much of the bill of complaint of Cragg as relates to the shares of stock mentioned therein of The Stromberg-Carlson Manufacturing Company of New York be dismissed for want of equity, and held that Brown had a right to make a charge for legal services against the individual stockholders whose stock was sold to Satterlee and Finucane for legal services rendered in and about the sale of the stock; and that for those services a reasonable charge would be $9,500, which was a firm asset, to be divided between Brown and Cragg. From this decree this appeal is prosecuted by appellants Cragg and Belfield. Brown also assigns cross-errors.

JOHN M. HARLAN, HENRY M. BATES, and GREGORY, POPPENHUSEN & McNAB, for appellants.

LOUIS SPAHN, for appellee; WHEELOCK, SHATTUCK & NEWEY, of counsel.

MR. JUSTICE SMITH delivered the opinion of the court.

The record shows that during the hearing before the master the desire or intention of the appellants, or either of them, to enter into an accounting as to the earnings of the respective firms, aside from the controversy concerning the shares of stock of the New York corporation received by appellee Brown, was expressly disclaimed. The arguments in this court, both printed and oral, are directed to the question as to the consideration upon which Brown received the shares in the New York Stromberg Company.

The primary questions are: (1) Were these shares of stock of the New York company received by Brown as a gift from Stromberg? or (2) were they received in payment for services rendered in promoting the reorganization of the Illinois company, as claimed by appellants? or (3) as a retainer according to the contracts of March 22, 1902?

The record in this case is voluminous. While we have given it careful study, we cannot deal with the evidence in an opinion except in a comprehensive way, and without any attempt to refer to it in detail.

The Stromberg-Carlson Telephone Manufacturing Company of Illinois was organized several years prior to the date of the filing of the bill herein. Its capital stock of $50,000 consisted of 2,000 shares of the par value of $25 each. Less than one-half of this had been paid for in cash, the balance having been issued for patents assigned to the company. The company was organized for the purpose of manufacturing electric merchandise. It was engaged chiefly in the manufacture and sale of telephone apparatus for independent

companies throughout the United States. Brown states in his sworn answer to an interrogatory in the cross-bill, that he first became a stockholder in the company to the extent of the forty shares in 1898, to the extent of eighty shares in 1899, and then to the extent of sixty shares in 1900, or the first part of 1901. According to the testimony of Shafer, one of the stockholders, it was agreed by the stockholders to let Brown have the balance of the treasury stock at par in 1899. The record shows that on December 30, 1899, by a resolution of the board of directors the remaining $5,350 par value of treasury stock was allotted to Brown at par value. The then treasurer of the company testified that the stock was allotted to Brown because he was very useful to the company, and had done a great deal for it in various ways.

At the time of the sale of the stock of the company to Satterlee and Finucane hereinafter referred to, the principal stockholders held stock of the following par value: Charles A. Brown, $3,850; Mrs. Brown, his wife, $500; A. B. Catton, Brown's father-in-law, $6,000; Alfred Stromberg, $15,000; A. Carlson, $12,500; J. W. Johnson, $8,000; and M. C. Wheaton, $2,000.

Appellee Brown is a lawyer, and for many years prior to this controversy was engaged in the practice of law in the city of Chicago, devoting himself to patent trade-mark and copyright law as a specialty. He had given much attention to electrical patent law, particularly to the law of telephony. He was successful in the practice of his profession, and at the time of this controversy, and prior thereto, he was possessed of a considerable amount of property, and was perhaps the man of greatest financial responsibility connected with the company. Besides acting as its general attorney and advising the officers of the company constantly in the business of the company, he frequently loaned money to the company to enable it to provide for its

payrolls, and for other purposes. Because of uncertainty as to the validity of its patents, the company had been required to give bonds throughout the country to indemnify operating companies using its manufactured product against loss by reason of the invalidity of its patents. The rapid development of the business of the company to large proportions, upon the small working capital of $25,000 cash paid in, soon made this sum of money inadequate, and the company was consequently in great need of money at times, and thus the financial and other assistance extended by appellee Brown was opportune and valuable. These facts, and others that might be mentioned, and the friendly relations that existed between Brown and Stromberg, the president of the company, together with the direct testimony of Brown, Satterlee and Stromberg, are relied upon by appellee Brown to sustain his contention that the stock was a gift to him by Stromberg. The record, however, shows other facts which, in our opinion, are of controlling importance in determining this question. The answer of appellee Brown to the bill of complaint, and particularly the portions thereof set out in substance in the statement preceding this opinion, wherein appellee avers that the 1,333 shares of the New York company were received by him in exchange for the shares in the Illinois company owned by himself and his wife, and for certain personal obligations from the Illinois company to him; and further, that all arrangements for the acquisition by the appellee and his wife of these shares were made long prior to the execution of the contracts of March 22, 1902.

The testimony of John M. Harlan as to a conversation with appellee just prior to the filing of the bill in this cause, wherein appellee took practically the same position as to the consideration for these shares and the manner of acquiring them which he afterwards set out in his answer, represents appellee as saying that while the other stockholders received fifteen dollars in

cash for each dollar of par value for their stock, he received an additional fifteen to one in the stock of the new company. True, Harlan's testimony was denied by appellee, but the substantive fact that appellee then claimed to have received the stock by purchase, and not by gift, appears distinctly and clearly asserted in appellee's answer subsequently filed.

Then there are the contracts of March 22, 1902, set out in the statement preceding this opinion, both signed by appellee. These contracts must be considered together in this proceeding. While one is a contract between appellee and the Illinois company, and the other is between appellee and Satterlee and Finucane, it must be remembered that when these contracts were made Satterlee and Finucane were the owners of the Illinois company and members of its board of directors which approved the contract with the company and ordered its president to sign it. Moreover, the contract with the company expressly provides for its assignment to any corporation thereafter to be organized for the purpose of taking over the capital stock and property of the Illinois company, and that appellee will fulfill for such corporation all his obligations under that instrument not performed by him prior to the assignment thereof. A court of equity will look through the form to the substance. These contracts are in substance and effect one contract.

That the contracts thus made were not shams and subterfuges is shown by the undisputed fact, testified to by Satterlee, that appellee has acted under the contract as the legal adviser of the New York company in its patent matters from its organization to the hearing of this cause. If one part of the contract was *bona fide* and real, so much so that it has been acted upon and is being carried out by the parties, the other part must be regarded in the same light. We cannot regard one part of the agreement as a sham or subterfuge, and the other part as *bona fide* and real.

A reading of these contracts shows that in express terms and in legal effect a gift of the shares in question was not made by Stromberg to appellee, nor is any such intention to be gathered from the documents. On the contrary, it clearly appears that they came to appellee from the New York company by virtue of the contracts, and in consideration of the making of the contract of employment or "service contract," as it is termed.

When the stock contract was signed, it appears from the testimony of Satterlee, who was asked to state the facts which culminated in the making of the document, that Finucane, Stromberg, Carlson, Brown and Satterlee were in Brown's office about the date of that contract; that on several different occasions Stromberg had said to Satterlee that the stock of the proposed New York corporation which he had stipulated for was to go in part to Brown; that Brown was the only man connected with the concern who had any particular responsibility outside of his holdings in the Stromberg-Carlson Company; that he had signed a lot of indemnifying bonds to purchasers of apparatus; that he was a man of good business judgment, and would be a valuable director in the New York company; that it was essential that he, Stromberg, should have somebody in touch with him in Chicago, to whom he could go for counsel in all matters of a business nature, or any other nature relating to the affairs of the company, and that he should insist upon Carlson and Brown being connected with it, and having a very substantial interest in it; that Brown's knowledge of telephone matters and his acquaintance with telephone men all over the country was extensive; that he was a very successful patent lawyer in telephone matters, and that he was a high-priced man, but he thought his services were worth the price.

Satterlee further testified that there was at that time no arrangement between Stromberg and himself that Brown was to have any definite number of shares

until that paper was signed; that along late in the afternoon, towards train time, these papers, of which this stock contract was one, were produced by Brown and placed on the table, and he was asked to sign them; that he looked them over, and talked with Finucane about them, and then signed them.

It should be said that it appears from Satterlee's testimony that in his conversations with appellee Brown about retaining him professionally, nothing had been said as to his receiving for his professional services, or otherwise, any shares of stock in the New York company. Nor had anything been said by Stromberg to Satterlee, or by Satterlee to Stromberg, to the effect that it would be necessary to give appellee Brown stock in the New York company in order to get him to execute a service contract.

It is clear, however, from this testimony, that a court would not be justified in coming to a conclusion that the stock in question was given to appellee by Stromberg because of gratitude for past services and acts of friendship. The evidence does not support, in our opinion, the conclusion of the master and the learned chancellor, that these contracts were merely a convenient vehicle for the transfer of this gift to Brown. On the contrary, a very different conclusion is forced upon the court by the evidence of the contracts and the facts surrounding the transaction and leading up to their execution.

The evidence shows that Brown and Stromberg and the other parties interested in the New York company believed that its stock was worth par at least. There is evidence in the record tending to show that the shares in question were worth from $160,000 to $200,000. Assuming that they were worth par, or $133,300, the overwhelming generosity of the gift, coming from Stromberg alone, casts a deep shadow of doubt upon the minds of the court, as to the proposition involved. We are asked to believe that Stromberg, actuated by gratitude and generosity, conferred

a fortune upon Brown in a most unusual, unexpected and remarkable manner. According to appellee's testimony he understood it was a gift from the first. If so, it is not clear why appellee in his original and amended answers (which do not agree the one with the other) claimed that the shares of stock in question were received by him in exchange for stock in the Illinois company, or, as to the 340 shares preferred, by purchase, and that he paid for them by his personal means. The answers were filed at dates not so remote from the receipt of the shares that appellee can be supposed to have forgotten the transaction, in whole or in part. The shifting of the positions in the answers themselves, and the fact that the contracts of March 22, 1902, signed by appellee give an entirely different version of the transaction from the answers, and that appellee's testimony is not reconcilable with either of the answers or the contracts, are, to say the least, unfortunate. We cannot regard the explanations of the contracts as at all adequate.

It is true, Stromberg corroborates appellee in the theory of a gift. Two facts are to be borne in mind while considering his testimony, namely: his friendship for Brown, and his situation with reference to the other stockholders in the Illinois company, except Shafer. Stromberg was called by the complainant and during the first part of his testimony manifested a singular stupidity for a man who had achieved the business success indicated by the prosperous career of the Illinois company, and who was as familiar as he must have been with the reorganization which had taken place. This obtuseness or inability to comprehend the questions put to him may have been the result of an imperfect understanding of the English language. During his examination he manifested intense partisanship and feeling. His testimony does not impress us as fair, reasonable or consistent. While he testified that the shares in question were given to Brown by him for past favors having no relation to

Brown's work in the reorganization, he also said, "What Mr. Brown got he paid for it."

Taking all the facts and circumstances into consideration with the direct testimony upon this point, our conclusion is that the finding of the master, and the learned chancellor, that the stock in question was given to Brown by Stromberg, was clearly against the weight of the evidence and wrong. The chancellor who entered the decree in this case did not see and hear the witnesses who testified for the respective parties, and hence the rule as to disturbing his findings in such case does not apply in this case.

The next question is, were the shares of stock in question received in payment for services rendered in promoting the reorganization of the Illinois company, as claimed by appellants?

We have stated the question involved here in its broadest form, for it nowhere appears either in the bill of complaint or cross-bill or the extended briefs of counsel for appellant, to whom specifically the services alleged to have been rendered were in fact rendered, whether to the stockholders of the Illinois company or to Satterlee and Finucane or to all the persons who became interested in the New York company when it was first organized. No attempt was made, and none was possible under the circumstances, to be specific as to the particular persons who either became liable for the services or who actually caused them to be paid for by the stock.

It appears from the record, as we have seen, that the business of the Illinois company from a small beginning grew rapidly to large proportions. Although the business of the company was very prosperous and the annual sales increased from $87,748.75 in 1895-1896 to $925,000 in the year 1900, and the net profits during the same period grew from $10,363.86 to $279,562.34, the company at times was in great need of money and was obliged to borrow money with which to meet its obligations. Stromberg testified that a few

years before the reorganization in question, they had installed a telephone plant at Rochester, New York, where Satterlee and Finucane resided. These gentlemen were officers and stockholders in the Rochester Telephone Company. Stromberg, Carlson and Brown, who owned a majority of the stock of the Illinois company, and Satterlee and Finucane conceived the idea of reorganization and enlargement of the Illinois company. Stromberg and his associates were moved to this course for the reason that more capital was needed in the business, and the Rochester people were doubtless influenced in the movement by the fear that the Illinois company might become identified with the Bell Company and thus be withdrawn from the independent field, to their injury; and both parties were doubtless prompted to engage in the reorganization scheme by the hope of the large gains and profits usually resulting from such schemes. Accordingly Stromberg made several visits to Rochester, and Satterlee and Finucane made many visits to Chicago in the progress of the negotiations.

It is clearly proved and not questioned that the negotiations took the form of a proposed sale of their stock by the stockholders of the Illinois company to Satterlee and Finucane as cash purchasers. The purchasers insisted upon a purchase of the entire stock of the Illinois company, or they would not purchase any of it. Accordingly the stockholders were requested to and did sign options or offers to sell their stock running to Brown at a price of fifteen dollars to one, except Shafer, who held out for a larger amount. This was paid to him before the deal was closed and his stock was secured. The purchase of all the stock of the Illinois company by Satterlee and Finucane was closed on or about March 22, 1902, and the contracts of that date discussed above were signed at the same time and as a part of the transaction.

The part taken by appellee Brown in this transaction is shown by the correspondence set out in the

record, and by the testimony of the parties to the transaction. It clearly appears, we think, from the evidence and the relations of the parties, that appellee Brown being one of the stockholders who were selling their stock was interested with them in obtaining for their stock respectively all that they could get for it. Satterlee and Finucane, as purchasers, were interested, on the other hand, in securing the stock on the best possible terms. It did not require the services of a lawyer on the part of the sellers to aid in fixing a price for the stock, or in transferring the certificates of stock after the price was agreed upon and paid. There is no doubt, and the evidence shows it, that appellee Brown, as one of the principal stockholders and in view of his official relation to the company, was constantly consulted and conferred with by the other stockholders, except Shafer; and that both sellers and purchasers made his office a convenient place for their meetings. But we do not think that this shows that appellee was acting in any other capacity than as a stockholder, and as a representative of his wife, who was a stockholder, in the ordinary business transaction of selling their shares. In the absence of proof of an employment by all or a part of the stockholders the law would not raise an implied contract of employment under the circumstances shown by the record. There is no evidence in the record of an employment, and there was therefore no basis for making a charge for professional services against the selling stockholders, and none was made by Brown.

Clearly, there was no basis for a charge for services against Satterlee and Finucane whose interests as purchasers were opposed to Brown and his associates. No legal services were required by the purchasers in the negotiations. Satterlee is a lawyer, and, it may be presumed, was able to attend to any legal questions of the character which would arise in the negotiations on behalf of Finucane and himself. The evidence is that they did not employ Brown for any purpose in

the negotiations or in the organization of the New York company. When it came to the transfer of all the property, rights and effects of the Illinois company to the New York company, Satterlee and Finucane employed a well-known law firm in Chicago.

Our conclusion on this question is, without extending the discussion further, that appellants have failed to prove the averments of the bill and cross-bill in this regard, and that Brown, owning and representing about one-fifth of the stock, was attending to his own private business in the negotiations leading up to the sale of the stock, and that he did not act in a representative capacity as counsellor and legal adviser, for which he should account to appellants or either of them.

It may be properly observed, in concluding what we have to say upon this question, that upon the formation of the legal firms, no restrictions were laid upon the partners as to their right to give such time as might be necessary to transact and care for their personal or private business and interests. The partners attended to their individual interests outside of the business of the partnerships as the necessity arose. In the absence of any special agreement restricting the rights of partners, they may give necessary time and attention to their private affairs, where it is not shown that any firm business has suffered thereby. Metcalfe v. Bradshaw, 145 Ill. 124; Northrop v. Phillips, 99 id. 449; Latta v. Kilbourn, 150 U. S. 524; Aas v. Benham, 2 Ch. D. 244; 2 Lindley on Partnership, Sec. 579.

We come now to the question, was the stock received by appellee Brown as a retainer for future services as stated in the contracts of March 22, 1902?

The bill of complaint avers the making of these contracts and sets them out in full. It avers that the said "service contract" is the contract mentioned and referred to in the said "stock contract." The bill further avers that about the date of the execution of these contracts the shares of stock in question and others

were issued and delivered to appellee Brown. It then avers that the said shares of stock were delivered to Brown either in consideration of the making and delivery by Brown of said "service contract" at the instance and request of Finucane and Satterlee, and of the agreements and promises by Brown in the "service contract," or in consideration of the services rendered by Brown in the organization and promotion of the New York company.

The cross-bill of appellant Belfield avers the making of the contracts but insists that the stock contract did not correctly represent the true consideration upon which Brown acquired or sought to acquire the stock.

The answer of Brown to these averments is set out in the statement preceding this opinion, and need not be here repeated.

The averment of the bill as to the consideration upon which Brown received the stock is in the alternative. What we have said above disposes of one of the alternative propositions or theories. What we have said *supra* as to the circumstances and manner of the execution of these contracts and their effect is applicable here upon the question of the consideration upon which Brown received the shares in question. Considering the contracts as one contract in effect and as relating to the same subject-matter, and as made at the same time and between the same parties and in the same interests in reality, although between different parties nominally, and it being conceded that one contract is being carried out and observed by the parties, we are inclined to the conclusion that the "stock contract" which has been executed must be held to express the true consideration for the transfer of the shares to appellee Brown.

It follows from these conclusions that there was no fraud perpetrated by appellee Brown in the dissolution and settlement of the firm of Charles A. Brown, Cragg & Belfield, for the stock in question was not

620    APPELLATE COURTS OF ILLINOIS.

VOL. 129.]    Chicago Term. Trans. R. R. Co. v. Korando.

contracted for or received by Brown during the existence of that firm, and the cross-bill of Belfield was properly dismissed for want of equity; and the decree on the cross-bill is affirmed.

The stock was contracted for and in legal effect secured during the existence of the firm of Charles A. Brown & Cragg, and in our opinion should be treated as an asset of that firm to be distributed according to the interests of the partners under the partnership agreement.

For the reasons indicated the decree of the Superior Court is affirmed in part and reversed in part and the cause is remanded to that court with directions to enter a decree in accordance with the views herein expressed.

*Affirmed in part and reversed in part with directions.*

Mr. Presiding Justice Freeman took no part in the decision of the case.